**AFFIRM; and Opinion issued March 6, 2013.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

No. 05-11-01600-CR

DANIEL WILLYAM, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the Criminal District Court No. 5
Dallas County, Texas
Trial Court Cause No. F09-60944-L

# OPINION

Before Justices O'Neill, FitzGerald, and Lang-Miers
Opinion By Justice O'Neill

A jury convicted appellant Daniel Willyam of murder and sentenced him to life in prison. On appeal, he argues the evidence is insufficient to support his conviction, and he was denied his constitutional right to confrontation by admission of his medical records. We affirm the trial court's judgment.

## Factual Background

In September of 2011, Samantha Nance, known by her friends and family as Shelley, was a student at the Art Institute of Dallas. She was serious about her school work and had a good head on her shoulders. She was easy to get along with and not the type to have enemies.

Shelley lived with another Art Institute student, Ashley Olvera, in The Falls apartment

complex. Shelley's boyfriend at the time was Nathan Shuck, who was also an Art Institute student. People described Nathan as shy and a "mama's boy." He did not drive much and relied on other people to take him places.

In September, he and Shelley had only been dating two months, and their relationship was not considered "super-serious." In fact, Ashley described it as "like one of those little high school crushes you have, at first." It was an innocent relationship, which had not progressed beyond holding hands.

During this time, Nathan lived with appellant and their friendship was described as a big brother/little brother relationship. Appellant cooked for Nathan, washed his clothes, cleaned the apartment, and often drove him places. However, appellant was openly homosexual, and people in their circle of friends said he was romantically interested in Nathan.

Ashley had been friends with appellant for awhile and described him as dramatic, and while he was always looking out for others, he found ways to turn things around and make them about himself. It was also known within the circle of friends that appellant did not approve of Nathan's relationship with Shelley. Appellant felt Nathan spent too much time with her, and his grades were suffering. Appellant shared these feelings with Ashley on several occasions. He even encouraged Ashley to talk to Shelley about cutting back on the amount of time she spent with Nathan. Nathan, however, said Shelley encouraged him to study and was not a bad influence on him.

In addition to talking with Ashley about the couple, appellant started texting her about them. While the texts often started off about something else, they usually "always end[ed] up talking about Nathan and Shelley." He expressed to Ashley on more than one occasion he did not feel Nathan was considerate of all the things he did for him such as laundry, cooking, and cleaning.

Shelley was aware of appellant's feelings towards her. She told Nathan she did not think appellant liked her. Ashley confirmed that appellant was not considered Shelley's friend or someone she hung out with.

Appellant became increasingly more upset that Nathan was not hanging out with him. He bothered Ashley about the couples' interactions, and it even progressed to the point he started asking if Shelley was in the apartment. Ashley said it seemed like he was trying to figure out if Shelley was home or with Nathan.

Prior to September 10, 2011, Ashley saw appellant at The Falls apartment complex. She could not remember the exact date, but said it was during the time Nathan and Shelley were dating. Appellant said, "I'm here to see a friend, but don't tell anybody because I've got a restraining order." Police records indicated there was no restraining order against him at the time. He did not provide any other information about why he was at the complex. That was the first time Ashley recalled seeing appellant in their complex, and she thought it was odd he repeatedly told her to keep it to herself.

During a separate incident around the same time, he also borrowed Ashley's car. The keys he borrowed included a key to Shelley's and Ashley's apartment. He claimed he needed the car to pick up Nathan.

On Thursday, September 10, Ashley began receiving text messages from appellant at approximately 10 a.m. Appellant wanted to meet with her to talk, but he did not say exactly what he wanted. He repeatedly asked if she was at school or the apartment. She kept providing excuses of why she could not meet him. She said the amount of texts on this particular day was not normal. She continued receiving texts from appellant asking what she was doing and if she was in her apartment until 1:15 p.m. However, the texts stopped between 10:37 a.m. and 12:03 p.m.

Ashley returned to the apartment after lunch that afternoon. She stayed in the entire evening and did not see Shelley. She went to her usual Friday morning class the next day without seeing Shelley.

On September 10, Shelley's parents left on a road trip to Yellowstone National Park. They texted their three daughters as they were leaving Texas but did not receive a response from Shelley. When they still had not heard from her on Friday morning, they contacted the Art Institute to see if she was in class. The school talked to Ashley, and she went home to check on Shelley.

When Ashley arrived at the apartment, she stuck her key in the lock, turned it, and walked inside. Because she followed her usual routine, she could not say for sure whether the door was unlocked before she used her key. She recalled that the door seemed easier to open than it had in the past.

After she entered their apartment, she went to Shelley's room. The door was slightly ajar, but she still knocked. When there was no response, she opened the door and immediately knew something was wrong because she saw Shelley's toes poking out from the end of a blanket and they were "pale, as white as you can think of." She saw blood on the blankets and assumed the worst. She then called a friend and 9-1-1.

When officers and paramedics arrived, they pronounced Shelley dead from multiple stab wounds. Detective Jason Gindrat with the Dallas Police Department investigated the crime scene. He did not observe any signs of forced entry or a burglary, but the patio door was unlocked.[1] Because there were no signs of forced entry, he did not dust for any fingerprints on the front door but did lift fingerprints from the patio door. He recovered latent prints from the interior of the patio

---

[1] The apartment was on the second floor.

door.   A comparison to known prints of appellant and Nathan excluded them as possible contributors.  Nothing in the record indicates the prints were compared to Shelley and Ashley.

Detective Gindrat noted a red substance on one of the sinks in the girls' shared bathroom. He also observed what he thought was a blood smear on the bathtub and a small amount of what appeared to be blood on the cabinet door underneath the sink.  He recovered latent fingerprints from the medicine cabinet in the bathroom.  After a comparison of the known fingerprints of appellant and Nathan, they were excluded as contributors to the medicine cabinet.  He also observed the bath tub in the apartment was wet.

Detective Gindrat described the position of Shelley's body as laying face down, as if she was attacked while sleeping.  He did not see any signs of a struggle.  He observed and collected a piece of blue material from her left hand and a piece of a green strap for forensic examination.[2]  The material did not appear to have come from anything inside her apartment.  He also collected her blood-covered bedding for DNA testing.

In the kitchen, he observed blood on the outside of the trash can and on the refrigerator door. He swabbed all these areas for further forensic testing.  A large knife and a steak knife were missing from the kitchen.

On September 12, 2011 at 7:30 a.m., Dr. Reade Quinton, the medical examiner, performed Shelley's autopsy.  At that time, Shelley's body had already gone through rigor mortis and was "loosening up again."  This process usually takes place twenty-four to thirty-six hours after death depending on refrigeration and environmental factors.  She also observed that Shelley's abdomen showed early signs of decomposition.

---

[2] There was some insinuation that the green strap could have been used to restrain Shelley, but the medical evidence did not show any ligature marks on her wrists.  There is little discussion in the record regarding this piece of evidence.  Rather, both parties focused on the piece of blue material.

She could not pinpoint to the hour Shelley's death, but she believed death most likely occurred in the previous one to two days, making it on Thursday or Friday. While she admitted it was possible death occurred two-and-a-half days earlier, based on the lack of decomposition, she did not think it was likely. She also could not narrow time of death specifically to Thursday between 9 a.m. and noon, which was the State's proposed time of death based on other circumstantial evidence.[3]

While several stab wounds were on the left side of Shelley's neck, the majority of them were on the right side of her neck. She also had a large cluster of wounds on her back. In total, Shelley was stabbed forty-two times. The wounds ranged in depths from less than an inch to three inches. Her right jugular vein and carotid artery were completely cut in half, and her left jugular vein and carotid artery were perforated. Dr. Quinton explained that the damage to her right jugular vein and carotid artery would have resulted in death in less than minutes.

Shelley also had a cluster of bruises in the deep soft tissue of her scalp. Dr. Quinton opined these were the result of blunt-force trauma, possibly from her head hitting the headboard of her bed. She also had cuts on her fingers that could have been defensive wounds. Dr. Quinton ultimately concluded Shelley was the victim of a homicide with cause of death from "multiple sharp-forced injuries." Detectives later described it as a crime of hatred and anger. Based on the number of stab wounds, Shelley was "overkilled."

The police began their investigation of Shelley's death with her inner-circle of friends, which included Ashley and Nathan. Officers first believed they had an open and shut case against Nathan. He did not have an alibi for the morning of Shelley's death, he had an extensive knife collection, and

---

[3] Jeremi Eldridge testified to exchanging text messages with Shelly on Wednesday night around 11 p.m. Records show her last text message was sent at 12:22 a.m on Thursday morning. The last time her computer registered any activity was Thursday morning at 5:57 a.m.

Shelley's mother told officers Shelley had discussed with her ending the relationship with Nathan.

Further, Nathan gave officers permission to search his and appellant's apartment. Inside Nathan's bathroom, which was also considered the guest bathroom, officers found a Ziploc baggie with a few strands of hair inside and what appeared to be blood on the outside of the baggie. They also found a feather near the baggie. Nathan was surprised by the discovery because it was not in his bathroom that morning before he left for school. Moreover, he did not collect feathers nor did he any idea why it was there.[4]

David Spence with the Southwest Institute of Forensic Science microscopically analyzed the hairs found on the baggie. Testing revealed that the blood stain on the baggie and the one hair strand matched Shelley's DNA profile.

However, as officers continued the investigation, they learned about appellant's feelings towards Shelley. He was the only person whose name repeatedly came up as openly disliking her. Thus, they began investigating his activities the days before Shelley's murder.

In addition to all the texts messages he sent to Ashley on Thursday, September 10 from approximately 10 a.m. to 1:15 p.m. asking whether she was at home, officers discovered he made several purchases from Walmart shortly after 10 a.m. on that day. David Miles, an asset protection manager for Walmart, compiled video footage from several different cameras that tracked appellant's movements around the store and provided it to investigators.

Footage showed appellant texting, and based on phone records, this was during the time he was texting Ashley. Appellant also purchased hair dye, Zest soap, and a box of gloves. It was common knowledge appellant dyed his hair to cover up some gray. It was also common knowledge

---

[4]There was some insinuation that feathers were involved in the video game World of War Craft, which appellant and some of his friends played.

he had a latex allergy so it was important for him to purchase hair dye that did not come with latex gloves. However, Chris Phillips, a friend and former roommate of appellant, testified appellant never purchased extra gloves when he bought hair dye.

After Shelley's body was discovered and officers searched appellant's apartment, appellant told Nathan that while visiting a friend at The Falls apartment complex on Thursday, September 10 he was robbed at knife point by a black man. He claimed the man took his wallet and a backpack full of clothes. Appellant said he had the backpack because he was washing his car and did not want to get his clothes dirty. He told the same story to Alison Morales, his third roommate, on Thursday afternoon. Appellant never reported this alleged crime to police.

Appellant later admitted to Alison he thought he would be blamed for the murder because people knew he hated Shelley. He did not, however, admit to killing her or conspiring to kill her.

As the investigation progressed, appellant gave officers permission to search his car. When they discovered what appeared to be blood on the gear shift, they seized his vehicle. Later testing determined Shelley's blood was not inside the car.

Courtney Ferreira, a forensic biologist, conducted the DNA analysis of evidence collected from Nathan's and appellant's apartment, their cars, and Shelley's apartment. While some of the swabs from Shelley's apartment tested positive for blood, not many swabs provided an ample DNA sample for analysis. The swab from the bathroom sink in Shelley's apartment matched her DNA profile. The swab from the bathtub, which tested presumptive for blood, was a mixture of two people, but Ferreira was unable to determine if one person contributed more than the other. Genetic markers expected to be observed if Shelley and Ashley were possible contributors were detected. However, no genetic markers were detected from appellant or Nathan. Thus, the males were excluded as possible contributors.

Other samples taken from Shelley's bathroom cabinet door, her headboard, and the blue material and green strap found on her body, matched her DNA profile. Appellant's DNA was not found anywhere in her apartment.

The genetic markers of an unknown male were found on the swab from the toilet handle in the guest bathroom of appellant's apartment. It was presumptive for blood but not confirmed. The genetic markers did not match the DNA profiles of appellant or Nathan.

John Witkowski, a forensic scientist at the Texas Department of Public Safety Regional Crime Lab, tested the blue material found in Shelley's hand. He compared the piece of material to a box of nitrile gloves used by the first responders from the fire department and a box of Reli On nitrile gloves purchased at Walmart about a month after the crime. Neither of these comparison samples were recovered from the crime scene or from appellant. Rather, these were samples independently acquired and submitted to the lab for comparison. A visual test immediately excluded the first responders' gloves. They were much darker in color and based on this distinction alone, no further testing was required. A visual test of the Reli On gloves did not exclude them as a possible match to the piece of material so Witkowski proceeded to a microscopic examination. The materials were consistent, but he noted some differences in the two types of gloves. The biggest difference was in color.

Ultimately, Witkowski was able to exclude the blue material found on Shelley's body as coming from the box submitted to him for comparison. He could not, however, necessarily conclude the material found on her was not from the same manufacturer just because of the variation in color. He also could not conclude that the material was consistent with only the manufacturer of Reli On gloves because several different manufacturers produced nitrile gloves. Without having the original source of the blue material, he could never say with one hundred percent certainty the piece

recovered from Shelley was from Reli On gloves purchased at Walmart.

After a thorough investigation of all the evidence and multiple suspects, officers arrested appellant. The State charged him with first degree murder. A jury convicted and sentenced him to life in prison. This appeal followed.

## Sufficiency of the Evidence

In his first issue, appellant argues the evidence is legally insufficient to support his conviction for first degree murder. He argues the State presented nothing more than evidence of his suspicious activity that coincided with the day of Shelley's murder. He acknowledges the State's theory that the murderer had to be either Nathan or him; however, with no fingerprints, no scientific evidence, and inconclusive evidence of motive linking him to the crime, appellant argues the evidence is insufficient to support his conviction. The State responds the circumstantial evidence supports the conviction, and the jury was free to disbelieve the defense's theories that (a) Nathan was the killer or (b) an unknown male committed the crime and tried to set appellant and/or Nathan up for the murder.

In reviewing the sufficiency of the evidence, the court considers all the evidence in the light most favorable to the jury's verdict and determines whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010). The trier of fact is the sole judge of the weight and credibility given to witness testimony. *Cain v. State*, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997). The reviewing court may not act as the "thirteenth juror" and reweigh the jury's determinations of the weight or credibility of the evidence. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007).

The standard is the same for both direct and circumstantial evidence. *Wise v. State*, 364 S.W.3d 900, 903 (Tex. Crim. App. 2012). The State need not disprove all reasonable hypotheses that are inconsistent with the defendant's guilt. *Id.* Rather, a court considers only whether the inferences necessary to establish guilt are reasonable based upon the cumulative force of all the evidence when considered in the light most favorable to the verdict. *Id.*; *see also Hooper v. State*, 214 S.W.3d 9, 12 (Tex. Crim. App. 2007).

A person commits the offense of murder if he intentionally or knowingly causes the death of an individual. TEX. PENAL CODE ANN. § 19.02(b)(1) (West 2011). The State has no burden to prove motive, which is not an essential element of a criminal offense. *Loudres v. State*, 614 S.W.2d 407, 411 (Tex. Crim. App. 1980) (noting while motive is relevant, it is not essential).

The State produced evidence that appellant was the only person who openly disliked Shelley. He was jealous of Shelley's relationship with Nathan and felt Nathan did not appreciate all that he did for him. Even though the State was not required to prove motive, the jury could infer appellant's hatred and jealousy served as his motive for killing Shelley. Although appellant claimed to be in a new relationship with Tri Thai and therefore had no reason to be jealous of Nathan and Shelley, the jury was free to discount this evidence.

The forty-two stab wounds established that this was a very personal, vicious attack, with no indication of any motive such as theft or sexual abuse. While investigators never found any physical evidence at the crime scene linking appellant to the murder, appellant admitted to both Nathan and Alison that he was at The Falls apartments on the day of the murder. Jurors could conclude he made up the false story about the robbery of his backpack and wallet as a way to explain his presence at the complex if challenged. They could also conclude his back pack was used to hide his clothing, worn and stained during the bloody attack.

A Walmart video taken on the day of the murder showed appellant purchasing items including a package of gloves not subsequently found at appellant's apartment. The Walmart was located near the victim's apartment.

Also, although no physical evidence at the crime scene pointed to appellant, physical evidence connected to the murder was found at appellant's apartment. Specifically, a baggie that was stained with Shelley's blood and hair was found in a common bathroom in his apartment. Although evidence indicated that this bathroom was used by Nathan, appellant could have put the blood-stained baggie there.

There was also evidence that could explain how appellant could have entered Shelley's apartment quietly. At some time before the crime, appellant borrowed the keys to Ashley's car. Her apartment key was on her key chain at the time, so appellant could have copied her apartment key while he had possession of the keys, thus enabling him to enter Shelley's apartment quietly and without force.

Records also indicated appellant repeatedly texted Ashley on the morning of the murder inquiring into her whereabouts. The texts abruptly stopped between 10:37 a.m. and 12:03 p.m., which is within the window of the medical examiner's time of death. Further, no testifying witness provided an alibi for appellant from the time the video footage showed him leaving Walmart until Ashley saw him Thursday afternoon.

As previously noted, appellant bought a box of blue nitrile gloves on the morning of the murder. Investigators recovered a piece of blue material consistent with nitrile gloves from Shelley's hand. Thus, the jury could infer appellant bought them to avoid leaving any fingerprints at the murder scene, and then disposed of the box.

Based on the circumstantial evidence, the inferences necessary to establish appellant's guilt are reasonable based upon the cumulative force of all the evidence when considered in the light most favorable to the verdict. *See Wise*, 364 S.W.3d at 903.

In reaching this conclusion, we reject appellant's alternative theories of the murder. The jury was faced with a myriad of evidence, both scientific and circumstantial, and a group of college students whose lives were interwoven from roommates to more serious relationships. While the defense presented evidence Nathan could have been the killer because (1) he did not have an alibi for the estimated time of Shelley's murder; (2) he could have been motivated to kill because he discovered Shelley wanted to end their relationship; (3) he had an extensive knife collection; (4) it was odd that when he first heard Shelley was missing, rather than trying to contact her, he hung around the school with his friends; and (5) investigators found the blood-stained Ziploc baggie with Shelley's hair in his bathroom, the jury was free to consider this evidence and reach a different conclusion based on the contrary evidence.

Moreover, Nathan testified at trial, and the jury was in the best position to weigh his credibility. The jury believed him when he adamantly denied killing Shelley. He denied knowing anything about her wanting to end the relationship, but even if it was true, he testified he would not kill her. The jury also saw first hand Nathan's demeanor and determined whether they believed he was capable of such a vicious crime or if the State's representation of him as a "mama's boy" was accurate.

The jury was also free to disbelieve appellant's theory that someone killed Shelley and tried to frame him for it. While appellant put on evidence Shelley had snubbed two other male students' advances, nothing tied the two men to the crime.

–13–

One of the men, Christopher Phillips, formerly lived with appellant and their friendship ended on a sour note. He admitted he may have kept a key to appellant's apartment after he moved out. However, he denied planting the Ziploc baggie in appellant's apartment and setting up appellant because he was mad at appellant and upset Shelley had rebuffed him. The jury determined he was credible, and we may not reweigh its conclusion. *Williams*, 235 S.W.3d at 750.

We acknowledge the record shows that genetic markers of an unknown male were found on the swab from the toilet in Nathan's bathroom where investigators discovered the Ziploc baggie. However, it was only presumptive for blood and not confirmed. Without any further evidence linking the "unknown male" to the crime and considering the circumstantial evidence against appellant, the jury was free to resolve the disputed evidence against him.

Regardless of whether this Court would have reached a different conclusion, we may not sit as the "thirteenth juror." The State was not required to disprove all reasonable hypotheses that were inconsistent with appellant's guilt. *Wise*, 364 S.W.3d at 903. Thus, after reviewing all the evidence in the light most favorable to the verdict, we conclude a rational trier of fact could have found appellant intentionally caused the death of Shelley beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; Brooks, 323 S.W.3d at 895. We overrule his first issue.

### Admission of Medical Records

In his second issue, appellant argues the trial court denied him his constitutional right to confrontation by introducing his Veterans Affairs medical records during punishment.[5] The State responds the trial court did not err and even if it did, the error does not require reversal.

---

[5] Appellant objected at trial the records were both irrelevant and denied him his confrontation rights; however, on appeal he raises only a confrontation argument.

The State read to the jury two particular portions of appellant's patient interview reports. The first involved appellant telling a psychologist he was upset with his superiors and might be tempted "to use pots and pans or hot grease and knives to hurt them." Appellant asked to be removed from the naval ship because he was concerned he would be irrational in the heat of the moment. He was removed from the ship in March of 2005.

The second instance involved an outburst in which he tore up his brother's room with a Samurai sword. He said he was surprised by his actions after he calmed down. The report stated, "He reports passive suicidal thinking in the past as well as one incident of homicidal rage, as described above though he does not report any planning or fantasizing about suicide or homicide."

Appellant contends admission of these statements allowed the State to label him "a ticking time bomb" and highlighted his homicidal ideations. He asserts the evidence was "extremely harmful" because he received a life sentence in a case where guilt and innocence was "fiercely" contested.

A trial court's decision to admit or exclude evidence is reviewed for an abuse of discretion. *Cameron v. State*, 241 S.W.3d 15, 19 (Tex. Crim. App. 2007). A trial court abuses its discretion when the ruling is outside the zone of reasonable disagreement. *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1990). However, whether a statement is testimonial and violates a defendant's right to confrontation is a question of law we review de novo. *Wall v. State*, 184 S.W.3d 730, 742 (Tex. Crim. App. 2006).

The Confrontation Clause of the Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI. In *Crawford v. Washington*, 541 U.S. 36 (2004), the Supreme Court held that out-of-court testimonial evidence violates the Confrontation Clause unless the declarant is

−15−

unavailable to testify, and the defendant had a prior opportunity to cross-examine him. *Id.* at 68; *see also Cuadros-Fernandez v. State*, 316 S.W.3d 645, 656 (Tex. App.—Dallas 2009, no pet.).

The threshold question is whether the medical records were testimonial or non-testimonial in nature. *Crawford*, 541 U.S. at 68. In *Crawford*, the Court drew a distinction between these two types of statements. While declining to provide a comprehensive definition of testimonial statements, it stated testimonial hearsay "applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Id.* The Court further noted business records were non-testimonial, as they fell under a hearsay exception. *Id.* at 57.

While medical records generally fall under the business records exception to the hearsay rule, courts have held that some records and lab reports are testimonial if "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Melendez- Diaz v. Mass.*, 557 U.S. 305, 310 (2009) (holding affidavits were testimonial when their sole purpose was to provide prima facie evidence of composition, quality, and net weight of drugs analyzed and it could be assumed analysts were aware of affidavits' evidentiary purpose); *Cuadros-Fernandez*, 316 S.W.3d at 656 (noting a hearsay statement is "testimonial" when the surrounding circumstances objectively indicate the primary purpose of the interview or interrogation is to establish or prove past events potentially relevant to later prosecution). However, medical records created for treatment purposes are not "testimonial" within the meaning of *Crawford*. *Smith v. State*, 05-09-01408-CR, 2011 WL 3278528, at *2 (Tex. App.—Dallas Aug. 2, 2011, pet. ref'd) (mem. op., not designated for publication).

Here, the portions of the medical records read to the jury were created for treatment purposes. The records were made years before Shelley's murder; therefore, their primary purpose was certainly not to prove events potentially relevant to a later prosecution. Moreover, other portions of the record

indicate they were created for the purpose of diagnosing and treating appellant for post-traumatic stress disorder and other various conditions. Because the medical records are not testimonial statements, Appellant's right to confrontation was not violated. We overrule his second issue.

## Conclusion

Having overruled appellant's two issues, the judgment of the trial court is affirmed.

MICHAEL J. O'NEILL
JUSTICE

Do Not Publish
TEX. R. APP. P. 47

111600F.U05



# Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

DANIEL WILLYAM, Appellant

No. 05-11-01600-CR     V.

THE STATE OF TEXAS, Appellee

Appeal from the Criminal District Court No. 5 of Dallas County, Texas. (Tr.Ct.No. F09-60944-L).
Opinion delivered by Justice O'Neill, Justices FitzGerald and Lang-Miers, participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered March 6, 2013.

MICHAEL J. O'NEILL
JUSTICE